## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

CASE NO. 01-6529-CIV-HUCK
Magistrate Judge Turnoff

AMERICAN DISABILITY ASSOCIATION, INC.,

     Plaintiff,

vs.

BFS RETAIL & COMMERCIAL OPERATIONS, LLC,

     Defendant.

_____/

FILED by CR D.C.

OCT 3 0 2002

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA · MIAMI

CLOSED CIVIL CASE

### FINAL JUDGMENT APPROVING CLASS CERTIFICATION
### AND PROPOSED AMENDED CONSENT DECREE
### AND DISMISSING ACTION WITH PREJUDICE

THIS CAUSE is before the Court to determine whether the class, preliminarily certified, and the Proposed Amended Consent Decree,[1] preliminarily approved by the Court on August 16, 2002, should be finally certified and approved. The Court, after having considered all relevant pleadings, orders, motions, briefs, stipulations, written objections and responses thereto, submissions, affidavits, and live testimony and legal argument presented over the course of two days' of fairness hearings, concludes, based on the totality of the circumstances, that final certification and approval of the proposed settlement is due to be granted.

---

[1] The plaintiff and defendant submitted a document styled "Parties' Stipulation Regarding Enhancements To The Preliminarily Approved Amended Consent Decree," which contained certain enhancements to the Proposed Amended Consent Decree that resulted from their discussions with objectors present at the first Fairness Hearing held in this matter on August 9, 2002. Because the Court granted the parties' motion to approve that Stipulation, references to the Proposed Amended Consent Decree shall mean such decree as enhanced by the Stipulation approved by the Court.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

In April, 2001, the plaintiff, American Disability Association, Inc., on its own behalf and on behalf of all others similarly situated, filed a class action complaint seeking declaratory and injunctive relief under the Title III of the Americans with Disabilities Act,  42 U.S.C. § 1211 *et. seq.*, ("ADA") against the defendant, BFS Retail & Commercial Operations, LLC ("BFRC" or "defendant").  Prior to this filing, the plaintiff organization, through its testers, had visited  a number of defendant's stores across the United States including locations in Florida; New Jersey; New York; Pennsylvania; Illinois; Texas; Washington; and California, which revealed that there were somewhat uniform "barriers to access" in those facilities.  Also prior to suit being filed, the defendant had completed a number of surveys, through an outside architectural firm, of its properties for the purpose of determining ADA compliance and had taken steps, where indicated, to enhance access at those sites.

BFRC answered the plaintiff's complaint in June 2001 and denied, as it has throughout the course of this litigation, that its stores violated the accessibility provisions of Title III.  Mandatory disclosures were exchanged pursuant to Rule 26, *Fed.R.Civ.P.*, and the parties then exchanged further discovery and began narrowing issues.  Because of the burden imposed by the defendant's response to plaintiff's discovery requests (making available some "two million documents" for inspection and copying) and the risks to the class inherent in the defendant's filing of a Rule 68 Offer of Judgement at the same time, the parties agreed to enter into immediate discussions to determine whether their differences could be resolved by a negotiated settlement.

A series of settlement meetings took place commencing in August, 2001.  These meetings were attended by the parties, their counsel and their respective experts on the ADA's accessibility requirements, building codes, and architecture.  The Court held status conferences periodically to determine the status of negotiations and the progress of the case.  Throughout the negotiations the

2

parties conducted additional informal discovery.  The proposed consent decree was negotiated over many months and was finally executed by the parties on March 4 and 5, 2002.  Each party and its experts concluded the Proposed Consent Decree was fair and reasonable and would result in all BFRC stores being accessible to persons with disabilities.

On March 5, 2002, the parties submitted a "Joint Motion for Order Granting Preliminary Approval of Proposed Consent Decree, to Conditionally Certify the Settlement Class and Scheduling a Fairness Hearing."  A Hearing on this Motion was held on March 14, 2002.  The Motion was granted on March 15, 2002, with the Court determining preliminarily that the Proposed Consent Decree was fair, reasonable, and adequate, and not a result of collusion.  The Court also determined that the proposed class satisfied the requirements for certification under Federal Rules of Civil Procedure 23(a) and 23(b)(2).  The parties provided notice pursuant to the terms of the consent decree.

Thereafter, objections were filed by the United States Attorney General, the Florida Attorney General, the American Council for the Blind and Kelly Pierce, and eleven state Protection and Advocacy agencies ("P&A Objectors").  The parties then engaged in negotiations with the objectors to attempt to resolve the objectors stated concerns prior to the scheduled fairness hearing.  The result was an Addendum to the Proposed Consent Decree, which resolved many of the objectors' issues and which resulted in the total withdrawal of objections by the Council for the Blind and Kelly Pierce and the Florida Attorney General.

The first Fairness Hearing took place on August 9, 2002.  All remaining objectors, the parties, and BFRC's ADA expert, James DiLuigi, were present.  At that hearing, the objectors took the position, *inter alia*, that there was an internal inconsistency between the scope of the class definition and the extent of the release.  After discussions between the parties and the objectors, the parties, with approval of the Court, revised the Proposed Consent Decree to remove that perceived ambiguity and made other

3

changes requested by the objectors. Notice of the resultant "Proposed Amended Consent Decree" was then given to the class as directed by the Court.

On August 16, 2002, the Court preliminarily approved the Proposed Amended Consent Decree and the proposed class definition and directed that notice be given to the class for an October 18, 2002 Fairness Hearing. Afterwards, the parties conferred with the Department of Justice and the P&A Objectors to try to resolve objectors' remaining, outstanding concerns. As a result, the parties filed a Stipulation on September 20, 2002, which resolved all of the remaining objections by the Department of Justice and all objections of the P&A Objectors, except for those involving the use of post-ADAAG tolerances. The Court approved this Stipulation.

On October 18, 2002, the Court conducted a second Fairness Hearing in this matter and heard approximately five hours of evidence from experts for the parties and the P&A Objectors, as well as legal argument by counsel for the parties and the P&A Objectors. As the Court related to the parties and the P&A Objectors at the conclusion of the October 18, 2002 Fairness Hearing, the thorough vetting of the positions of the parties and the objectors was very helpful and illuminating to the Court and has convinced the Court that the class should be finally certified and that the Proposed Amended Consent Decree is a fair, reasonable and adequate resolution of the matters at issue in this litigation.

## II      FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.      THE PROPOSED CLASS SATISFIES THE REQUIREMENTS OF RULES 23(a) AND 23(b)(2)

Plaintiff seeks certification of a class of individuals with mobility and/or dexterity disabilities as defined by Title III of the ADA, to-wit:

4

> **"Settlement Class"** means all persons who have or claim they have, or will have or will claim they have been, prior to and during the term of the consent decree, denied full and equal access to or have been discriminated against under Title III of the ADA or regulations promulgated thereunder, at or in connection with one or more BFRC Retail Tire and Service Stores, because they are persons with mobility disabilities or dexterity disabilities covered by Title III of the ADA who could otherwise assert such a claim against BFRC. Although the class was originally defined to include persons with visual disabilities, as defined under the Americans with Disabilities Act, the class has now been redefined to exclude such persons. Accordingly, nothing in this Decree shall have any preclusive effect on Title III claims in which the pertinent disability is the diminished or absent ability to see or where the claimant is regarded as having such a disability.

Proposed Amended Consent Decree at § 2.38. The parties have represented that the goal of certification, in conjunction with the settlement proposed by the parties, is to:

> (a) achieve improvements, where needed, to access at BFRC Retail Tire and Services Stores; (b) achieve those improvements in a manner which satisfies BFRC's obligations under the ADA and ADA-Related Laws and is consistent with the fundamental nature of BFRC's business for the benefit of both BFRC and its customers; and (c) avoid the uncertainties and costs of further or future litigation.

Proposed Amended Consent Decree at § 1.4. The Court finds that the parties do, in fact, share this aim and that the final granting of class certification and final approval of the settlement proposed by the parties will allow the accessibility enhancements of the Proposed Amended Consent Decree to be effected. Thus, the Court finds the proposed settlement to be in the best interests of the class. Moreover, the Court finds that, absent class certification,

> the prosecution of separate actions by or against individual members of the class would create the risk of (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class or (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

Rule 23(b)(1), *Fed.R.Civ.P.* Such a result, the Court finds, would be directly counter to the best interests of the class.

Class certification requires that there be (1) numerosity, (2) typicality, (3) commonality, and (4) adequacy of representation, Rule 23(a), *Fed.R.Civ.P*; *Amchem Products v. Windsor*, 521 U.S. 591, 613 (1997). Courts have consistently granted certification and approved proposed consent decrees in cases like the instant one where violations of Title III of the Americans with Disabilities Act are alleged. *See Access Now, Inc. v. AHM CGH., Inc.*, No. 98-3004-CIV-GOLD, 2000 WL 1809979 (S.D. Fla. July 12, 2002); *Access Now, Inc. v. Claire's Stores, Inc.*, No. 00-14017-CIV-MOORE, 2002 WL 1162422 (S.D. Fla. May 7, 2002); *Access Now, Inc. v. Ambulatory Surgery Center Group, Ltd.*, 197 F.R.D. 522, 525 (S.D. Fla. 2000)[2]; *Ass'n For Disabled Americans v. Amoco Oil Co., Inc.*, No. 98-2002-

---

[2] Footnote 1 to this opinion contains a survey listing of many other similarly decided cases:

> *See Colorado Cross-Disability Coalition v. Taco Bell Corp.*, 184 F.R.D. 354 (D.Colo.1999) (certifying class of persons who use wheelchairs and scooters in an action against a fast food chain for failing to comply with ADA Accessibility Guidelines and tracking Colorado state law); *Arnold v. United Theatre Circuit, Inc.*, 158 F.R.D. 439, 460 (N.D. Cal. 1994), *modified*, 158 F.R.D. 439, 460 (N.D. Cal. 1994) (certifying a class of disabled persons who used wheelchairs or who walked using aids that sought removal of architectural barriers in theaters pursuant to the ADA and tracking California state Law); *Leiken v. Squaw Valley Ski Corp.*, 3 A.D. Cas. 945, 954 (E.D. Cal. June 28, 1994) (certifying a class of physically disabled persons who were denied full and equal access to, or who were dissuaded from visiting, a recreational resort because of certain architectural barriers and because of the defendant's policy of prohibiting persons who used wheelchairs from riding a cable car to one part of the resort); *Civic Ass'n of the Deaf of New York City, Inc. v. Giuliani*, 915 F. Supp. 622, 634 (S.D.N.Y. 1996) (certifying a class consisting of persons with disabilities who were deaf or hearing-impaired that brought suit under the ADA to prevent the defendants from replacing fire alarm boxes on New York City streets with notification alternatives that were not accessible to deaf or hearing-impaired persons); *Anderson v. Pa. Department of Pub. Welfare*, 1 F. Supp.2d 456, 462 (E.D. Pa. 1998) (certifying a class of participants with mobility and/or vision impairments that brought suit under the

CIV-GOLD, slip op. (S.D. Fla. Feb. 19, 2002) ( Doc. No. 90).  In these decisions, the courts have uniformly held that actions seeking injunctive relief by persons with disabilities to gain access to places of public accommodation satisfy Rule 23(a) and are proper for certification under Rule 23(b)(2). Similarly, in the present case, which addresses only the remedy of injunction provided in 42 U.S.C. §2188, the class should be certified.

## 1.   THE CLASS IS SUFFICIENTLY NUMEROUS TO MAKE JOINDER IMPRACTICABLE

The putative class in this case is too numerous to make joinder practicable, and such impracticability meets the requirements of Rule 23(a)(1).  *See Phillips v. Joint Legislative Committee*, 637 F.2d 1014, 1022 (5th Cir. 1981), *cert. denied* 456 U.S. 960 (1982).  In determining class size, the

---

ADA to obtain certain accessibility improvements in a managed health-care program); *Clark v. California*, No. C96-1486 FMS, 1998 WL 242688 at *6 (N.D. Cal. May 11, 1998) (refusing to decertify a class of developmentally-disabled inmates seeking certain accessibility improvements in a prison system pursuant, in part, to the ADA); *Neff v. VIA Metro. Transit Auth.*, 179 F.R.D. 185, 196 (W.D. Tex. 1998) (certifying a class consisting of individuals with disabilities covered by the ADA and Rehabilitation Act who were eligible to use the defendants' transportation services and facilities); *Thrope v. Ohio*, 173 F.R.D. 483, 491 (S.D. Ohio 1997) (certifying a class consisting of Ohio residents who purchased handicap parking placards, seeking, under the ADA, to force defendants to provide such placards without charge); *Berlowitz v. Nob Hill Masonic Management, Inc.*, No. C-96-01241 MHP, 1996 WL 724776 at *5 (N.D. Cal. Dec.6, 1996) (certifying a class consisting of all persons in California with physical disabilities who were denied the right to full and equal access to, and use and enjoyment of, a concert arena in an action seeking removal of architectural barriers under the ADA and tracking state law); *Guckenberger v. Boston Univ.*, 957 F.Supp 306 (D. Mass. 1997) (certifying a class consisting of all students with learning disabilities and/or attention deficit disorder enrolled at Boston University suffering discrimination against the learning disabled).

exact number of potential members need not be shown. *Carpenter v. Davis*, 424 F.2d 257, 260 (5th Cir. 1970) ("not necessary that the members of the class be so clearly identified that any member can be presently ascertained"). It is necessary only to show the number of persons who "might have been prejudiced" by the challenged practices. *General Telephone Company of the Southwest v. Falcon*, 457 U.S. 147, 158 n.1 (1982). And it is not necessary that "all members of the (b)(2) class be aggrieved by or desire to challenge the defendant's conduct". *Davis v. Weir*, 497 F.2d 139, 146 (5th Cir. 1974).[3] Here, the Court recognizes from census data provided,[4] common sense assumptions, and the representations of both the parties and the objectors, that the class embraces at least hundreds of thousands, if not millions, of individuals, thus making joinder impracticable. The census data, standing alone, demonstrates that joinder is impracticable, and the additional submissions by the parties and the objectors have reinforced this conclusion. Although no specific finding as to the size of a putative class is required, a court "may examine statistical data and then draw reasonable inferences from the facts in determining whether the numerosity requirement has been met." *Pottinger v. City of Miami*, 720 F. Supp. 955 (S.D. Fla.1989) (cited with approval in *AHM CGH, Inc.*, 2000 WL 18009979, at *2); *Padron v. Feaver*, 180 F.R.D. 448, 639 (S.D. Fla.1998) (certifying class of persons denied supplementary security income benefits and extrapolating from national statistics the number of persons similarly denied benefits); *see also Civic Ass'n of the Deaf of New York City, Inc. v. Giuliani*,

---

[3] *See also Williams v. New Orleans Steamship Ass'n*, 673 F.2d 742, 755 (5th Cir. 1982) ("During the relevant time period there were hundreds of blacks working . . . any or all of whom might have been affected by the discrimination"); *Petty v. Peoples Gas Light and Coke Co.*, 86 F.R.D. 336, 28 FEP Cases 1279, 1281-1283 (N.D. Ill. 1979) (numerosity satisfied by reference to total number of black employees without any proof that identifiable members were actually discrimination victims).

[4] Specifically, the Court has reviewed statistical data provided in the form of the 1990 Census Table 3; and the Household Economic Study, current Population Reports at 61-70, American with Disabilities Act 1994-95 by John McNeil.

915 F. Supp. 622, 632 (S.D.N.Y.1996) ("precise quantification of the class members is not necessary because the court may make 'common sense assumptions' to support a finding of numerosity") (citation omitted); *Arnold v. United Artist Theatres Circuit, Inc.*, 158 F.R.D. 439, 448 (N.D. Cal. 1994) ("By the very nature of the Class, its members [with disabilities] are unknown and cannot be readily identified. For these reasons, the court concludes that joinder is impracticable - indeed, impossible."). Indeed, no party or objector has claimed that the putative class in this action does not meet the structures of Rule 23(a). Classes much smaller than the one sought here have been found too numerous for joinder.[5]

Thus, based on the number of class members who are likely to be affected by the discriminatory practices alleged by the plaintiff, their dispersion throughout the United States, and the impracticability of joining this unidentifiable number of such persons, the Court finds that the class sought herein is too numerous for joinder to be practicable. This conclusion is bolstered by the fact that the parties' settlement entails significant prospective injunctive relief which will inure to the benefit of additional unidentifiable class members. *Lewis v. Gross*, 663 F. Supp. 1164, 1169 (E.D.N.Y. 1996) (where prospective injunctive relief is involved, the class properly includes an unidentifiable number of persons who might be affected by the challenged conditions in the future, thus satisfying Rule 23(a)).

---

[5] *See, e.g., Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1038 (5th Cir. 1981) (classes with 25 or 30 members have been certified); *Phillips,* 637 F.2d at 1022 (33 identifiable members and unknown number of unidentifiable future members too numerous for joinder); *Jack v. American Linen Supply,* 498 F.2d 122, 124 (5th Cir. 1974) (51 identifiable current employees and an unknown number of future employees may satisfy numerosity); *Brady v. Thuston Motor Lines*, 726 F.2d 136, 145 (4th Cir. 1984) (74 persons is "well within the range appropriate for class certification"); *Paxton v. Union Nat'l Bank,* 688 F.2d 552, 560-561 (8th Cir. 1982) (74 too numerous for joinder); *Jordan v. County of Los Angeles,* 669 F.2d 1311 (9th Cir. 1982) (110 persons who were difficult to locate and geographically dispersed was too numerous for joinder); *Williams,* 673 F.2d at 755-56 ("hundreds" too numerous for joinder); *Hughes v. Jim Walter Resources*, 94 F.R.D. 17, 29 F.E.P. Cases 825 (N.D. Ala. 1981) (certifying a class of 197 black applicants).

## 2. COMMON QUESTIONS OF LAW AND FACT UNITE THE CLAIMS OF THE NAMED PLAINTIFF AND THE PUTATIVE CLASS

Rule 23 serves two principal purposes: (1) to promote efficiency and economy of litigation through the avoidance of a multiplicity of suits and the introduction of cumulative evidence; and (2) to protect the right of aggrieved persons who might not take the affirmative step of presenting claims on an individual basis. *Crown Cork & Seal Co. v. Parker*, 462 U.S. 345, 350 (1983); *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 471-73, *reh'g denied*, 785 F.2d 1034 (5th Cir. 1986). In order to effectuate these purposes, district courts are afforded "wide discretion to decide whether to certify a proposed class." *Shipes v. Trinity Indus.*, 987 F.2d 311, 316 (5th Cir.), *cert. denied*, 510 U.S. 991 (1993).

As stated by the Supreme Court in *Falcon,* a Rule 23(b)(2) class action case, the judicial economy and efficiency obtained in cases such as this, where class members are affected by common policies, practices, and procedures, make certification under Rule 23(b)(2) particularly compelling:

> Class relief is "peculiarly appropriate" when the "issues involved are common to the class as a whole" and when they "turn on questions of law applicable in the same manner to each member of the class." For in such cases, "the class-action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion under Rule 23."

*Falcon*, 457 U.S. at 155 (internal citations omitted).

Commonality is satisfied in this action. "Rule 23 does not require that all the questions of law and fact raised by the dispute be common." *Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1557 (11th Cir. 1986), *cert. denied*, 479 U.S. 883 (1986); *Baby Neal v. Casey*, 43 F.3d. 48,56 (3d Cir. 1998) (commonality does not require every issue to be common to the class, as long as the claims of the plaintiff and the members of the class are based on the same legal and remedial theory). To

demonstrate commonality, "[i]t is only necessary to find at least one issue common to all class members." *Pottinger*, 720 F. Supp. at 958. There are clearly common questions of law and fact in this case because BFRC's alleged non-compliance with the requirements of Title III of the ADA affects the class members in the same way by purportedly denying them access to BFRC's stores. This case involves architectural features of defendant's retail stores that are alleged to represent barriers to access; these features and barriers are common, in whole or in part, to BFRC's stores and have been identified and addressed in detail by the parties and objectors alike. Indeed, the photographic exhibits to the Complaint, together with the affidavit submissions and the live Fairness Hearing testimony, reveal a common, core group of alleged ADA violations which impact accessibility to class members in an almost uniform matter. All such alleged ADA violations can be addressed in a common way that will not vary in any significant way from store to store and will be beneficial to all class members, so as to effectuate the purpose of the ADA. Here, what is sought is solely injunctive relief, and the remedy afforded is generally to people who suffer mobility and dexterity disabilities.[6] The remedies here provided will, *inter alia*, create accessible routes, parking, door handles, ramps and bathrooms and provide for policies aimed at accommodating persons with these and other disabilities. This relief will provide a common benefit to each and every member of the class. That class members' disabilities might differ in some respects is of no moment, as long as the class representative and the class members have common interests and injury. That is the case here in that the named plaintiff and the class all are allegedly denied access to BFRC's stores. *Ambulatory Surgery*, 197 F.R.D. at 527-28 (commonality and typicality met despite differences in physical disabilities, because "the representative Plaintiffs have

---

[6] Objectors originally opposed the inclusion of all the disabilities in the settlement class definition contained in the Proposed Consent Decree. By Stipulation, that definition was modified such that only persons with mobility and/or dexterity disabilities are now included in that definition, and no objection to this revised definition has been made.

the same interests and suffer the same injuries as the class members in that they are allegedly denied access to the same facilities."); *Neff v. VIA Metro. Transit Auth.*, 179 F.R.D. 185, 196 (W.D. Tex 1998) (differing forms of disabilities does not defeat commonality where class members share common aim of making defendant's facilities accessible to them); *Arnold*, 158 F.R.D. at 450 ("in a public accommodations suit... the interests, injuries and claims of the class members are, in truth, identical such that any class member could satisfy the typicality requirement for class representation.").

Litigation by individual class members, on a store-by-store and element-by-element basis, can be avoided only if the class is certified. Absent certification, class members will not be bound on any issue in other lawsuits. As the Eleventh Circuit has recognized: "By releasing some class members from the suit at this stage, a trial judge would invite the repeated litigation of the pattern and practice issue, with lamentable consequences for judicial economy and the finality and consistency of judgments." *Cox*, 784 F.2d at 1554.

### 3.   THE CLAIMS OF THE NAMED PLAINTIFF ARE TYPICAL OF THE CLAIMS OF THE CLASS

Typicality's requirement, that claims asserted by a representative plaintiffs must be typical of the claims of the class, is satisfied if the claims are based on the same or similar theory, even if factual differences exist. "[T]he test for typicality, like commonality, is not demanding." *Forbush v. J.C. Penney Co.*, 994 F.2d 1101, 1106 (5th Cir. 1993); *Shipes*, 978 F.2d at 316 ("The threshold requirements of commonality and typicality are not high; Rule 23(a) requires only that resolution of the common questions affect all or a substantial number of the class members."). Typicality does not require that the plaintiff and class members be in identical circumstances. *Cox.*, 784 F.2d at 1557; *see also Appleyard v. Wallace*, 754 F.2d 955, 958 (11th Cir. 1985); *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 293 (2d Cir. 1999) (typicality "criterion does not require that the factual background of

each named plaintiff's claim be identical to that of all class members"); *Senter v. General Motors Corp.*, 532 F.2d 511 (6th Cir. 1976); 7A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure §1764 (1986) at 235-41.  As the Court stated in *Falcon*:

> The commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances the maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.

*Falcon,* 457 U.S. at 157 n.13.

Rule 23(a)'s typicality requirement is met here.  The allegation of readily identifiable accessibility barriers for  persons, such as those represented by Plaintiff, with mobility and dexterity disabilities at approximately 2,200 BFRC stores satisfies the low threshold for typicality:

> Plaintiffs' claims are typical of the class where, as here, their claims "arise from the same event or pattern or practice and are based on the same legal theory" as the claims of the class.  There is no requirement that the named plaintiffs each personally experience every difficulty outlined in the complaint.  Rather, it is sufficient that the claims of the named Plaintiffs are substantially similar to the claims of the class.

*Shores v. Publix Super Markets, Inc.*, No. 95-1162-CIV-T-25-(E), 1996 WL 407850, at *23 (M.D. Fla. March 12, 2002) (*quoting Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984), *cert. denied*, 470 U.S. 1004 (1985)); *Diaz v. Hillsborough County Hosp. Auth.*, 165 F.R.D. 689, 694 (M.D. Fla. 1996).  That requirement is met in this case because barriers to access, for persons with mobility and dexterity disabilities, cause injury in a manner that is virtually identical to all members of the class.

## 4.   THE PLAINTIFF AND PLAINTIFF'S COUNSEL ADEQUATELY REPRESENT THE AND PROTECT THE CLASS

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Rule 23(a)(4), *Fed.R.Civ.P.* "The adequate representation requirement involves questions of whether plaintiffs' counsel are qualified, experienced, and generally able to conduct the proposed litigation, and of whether plaintiffs have interests antagonistic to those of the rest of the class" *Griffin v. Carlin*, 755 F.2d 1516, 1533 (11th Cir. 1985).   These requirements are easily met in this case, and, indeed, no objection to the Proposed Amended Consent Decree has been lodged to claim otherwise.

First, the plaintiff and plaintiff class are represented by attorneys who are "qualified, experienced and generally able to conduct the proposed litigation." *Johnson v. Georgia Highway Express, Inc.,* 417 F.2d 1122, 1125 (5th Cir. 1969). They have successfully represented plaintiffs in many cases, including ones with class allegations, involving enforcement of Title III accessibility issues and have demonstrated that they have sufficient time, resources and skill to vigorously prosecute the class claims in the case at bar.  Second, there is no hint of collusion between the parties or any conflict of interest between the class representative and the class.  No objector has suggested any collusion between the parties. Finally, with regard to the representative plaintiff, adequate representation requires that the representative plaintiff has a common interest with the class, whose interest will be vigorously prosecuted.[7] *Cook v. Rockwell International Corp.*, 151 F.R.D. 378, 386 (D. Colo. 1993).  Here, the

---

[7] Although not contested with regard to the Proposed Amended Consent Decree, it is clear that the named plaintiff has satisfied the requirement of standing in this matter, including establishing standing through its use of "testers" to confront barriers to access at BFRC's stores. The issue of this plaintiff's standing to bring ADA accessibility actions has been litigated in several cases in the Southern District, all with uniform results finding Article III standing: *American Disability Ass'n, Inc. v. Schiltz*, No. 00-8495-CIV-HURLEY (S.D. Fla. Aug. 8, 2000) (Doc. No. 15); *American Disability Ass'n, Inc. v. JJM, Inc.*, No. 00-8761-CIV-ZLOCH (S.D. Fla. Feb. 26, 2001)

remedy – accessibility to BFRC's stores -- sought by the named class representative is the same remedy which would be sought by individual class members if they were to file separate lawsuits; the class representative gains nothing more, including any financial reward, than is being gained by the class. What is obtained is a meeting of the plaintiff's organizational purpose, which by its terms, serves the common interest of the class. This plaintiff has successfully litigated and obtained ADA settlements against places of public accommodation, with courts of this District retaining jurisdiction to enforce the settlement terms in over fifty Title III cases. In other cases, plaintiff has secured ADA compliance by private agreement, without the need for court intervention. Recently, in *American Disability Association, Inc. v. Enterprise Rent-A-Car Company*, No. 01-7511-CIV-SEITZ (S.D. Fla. Sept. 5, 2002) (Doc. No. 37), the court conditionally certified a statewide class and preliminarily approved a Proposed Consent Decree similar to the one in the present case. This activity illustrates the plaintiff's ongoing commitment to its stated purpose of achieving accessibility in places of public accommodation.

### 5.    THE PROPOSED CLASS IS PROPERLY CERTIFIED UNDER RULE 23 (B)(2) AND ADEQUATE NOTICE WAS GIVEN

Certification under Rule 23(b)(2) is appropriate where

> the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

Rule 23(b)(2), *Fed. R. Civ. P.* The primary function of Rule 23(b)(2) is to furnish a device for obtaining injunctive relief from civil rights violations that affect a class. *Ticor Title Ins. Co. v. Brown*, 511 U.S. 117 (1994); *Ashmus v. Calderon*, 935 F. Supp. 1048, 1067 (N.D. Cal.1996) (Rule 23(b)(2)

---

(Doc. No. 18); *American Disability Ass'n, Inc. v. Chmielarz*, No. 00-7281-CIV-ZLOCH (S.D. Fla. Feb. 26, 2001) (Doc. No. 21); *American Disability Ass'n, Inc. v. DI-MI Investments Corp*, Case No. 01-6300-CIV-DIMITROULEAS (S.D. Fla. July 13, 2001) (Doc. No. 18).

"was specifically drafted to facilitate vindication of civil rights particularly where, as here, that vindication can be remedied through injunctive relief."). The Proposed Amended Consent Decree meets (b)(2)'s strictures because the relief sought in this action is purely injunctive and declaratory.[8] Here, the allegations against BFRC - of maintaining stores in such a way that they are inaccessible to persons with mobility and dexterity disabilities - represent a paradigmatic case for certification under Rule 23(b)(2) because the plaintiff and plaintiff class are seeking purely injunctive relief to remedy BFRC's alleged non-compliance with Title III which is a federal civil rights statute. Thus, this action is properly suited for class treatment under Rule 23(b)(2). *See generally, Amoco Oil, supra*; *Ambulatory Surgery*, 197 F.R.D. at 529.

While notice is not required where, as here, (b)(2) certification is sought, *Eisen v. Carlisle*, 417 U.S. 156, 177 n. 14 (1974), the parties suggested several forms of notice that could be given which the Court approved. These included publishing notice in USA Today, posting the Proposed Amended Consent Decree, together with its exhibits, on class counsel's web site, posting notice at each of BFRC's 2,200 store locations, giving notice of the pendency of this action and its proposed settlement to thirty-one disability organizations, providing notice to several disability organizations with a request that they post the notice on their web sites and giving direct notice to the United States Attorney General. The response from the objectors substantiates the effectiveness of the notice given. The Court finds that the parties did comply with its order in this regard and that the notice given by them exceeds the requirements of due process. *See generally, Amoco Oil Co.*, slip op. at 15-16.

---

[8]     The Proposed Amended Consent Decree reflects the deletion of damage claims that the parties voluntarily excised from the Proposed Consent Decree in August, 2002, after discussions with all of the then objectors. No objection has been raised that the Proposed Amended Consent Decree does not meet (b)(2)'s requirements for certification.

**B.    THE PROPOSED AMENDED CONSENT DECREE IS FAIR AND REASONABLE AND DUE TO BE FINALLY APPROVED**

While Rule 23(e) requires judicial approval of any class action settlement, case law makes clear that approval should be given, provided the settlement is "fair, adequate and reasonable, and is not the product of collusion between the parties." *Bennett v. Behring Corp.,* 737 F.2d. 982, 986 (11th Cir. 1984)(*quoting Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir. 1977)).  Such a determination is "left to the sound discretion of the trial court and...will not be overturn[ed]... absent a clear showing of abuse of that discretion", *Bennett,* 737 F.2d at 986, and should be informed by the "clear policy in favor of encouraging settlements...particularly in an area where voluntary compliance by the parties over an extended period will contribute significantly toward ultimate achievement of statutory goals." *Patterson v. Newspaper & Mail Deliverers' Union.,* 514 F.2d 767, 771 (2d Cir 1975) (citations omitted).  "There is a particularly strong public interest in favor of [class action suit] settlements." *Cotton,* 559 F.2d at 1331.

In determining whether the settlement is fair, adequate and reasonable, the Court must consider all relevant factors, including (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recover at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of the litigation; (5) the substance and amount of opposition to the settlement; and (6) the state of proceedings at which the settlement was achieved. *Bennett,* 737 F.2d at 986.

It is not the trial court's role to "substitute its own judgment for that of [the parties'] counsel or to make the settlement's proponents "justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained."  Rather, the Court should approach its task, mindful that "compromise is the essence of settlement" and that "practical considerations [must

be] taken into account." *Cotton*, 559 F.2d at 1330. While an objector's concerns must be heard, there is no requirement that each detail of the proposed settlement be examined *ad nauseam*; indeed, the court is vested with discretion to "limit its proceeding to whatever is necessary to aid it in reaching an informed, just and reasoned decision." *Cotton*, 559 F.2d at 1131.

In this case, there is only one remaining objection, though it is brought by the collective group of eleven state protection and advocacy agencies through the Illinois protection and advocacy agency known as Equip for Equality. As stated in their objection, the only facet of the Proposed Amended Consent Decree which they challenge is the use of, what have been generally referenced as post-ADA Accessibility Guidelines ("ADAAG") "tolerances" for new construction and alterations as those terms are contemplated by the ADA: "Thus, for the purposes of the fairness determination that this Court must make, the only issue is whether the terms of the settlement proposed are appropriate (fair and reasonable) for 'new construction' and 'alterations.'" That only one objection remains, and, essentially, only one objector, albeit in a representative capacity, remains before the Court after all of the notice efforts publicizing the Proposed Amended Consent Decree is significant. It exemplifies the amount of good faith effort and level of expertise brought to bear by the parties, their counsel and ADA accessibility experts in formulating the settlement that is before the Court. As the Eleventh Circuit has held, the quantity of objectors, while not controlling, is a factor properly taken into account by the trial court in assessing a settlement's fairness and reasonableness:

> In assessing the fairness of the proposed compromise, the number of objectors is a factor to be considered but is not controlling. A settlement can be fair notwithstanding a large number of class members who oppose it.

*Cotton*, 559 F.2d at 1331. That the United States Department of Justice, which is charged by law to enforce Title III's provisions and which objected to the original Proposed Consent Decree, did not

interpose an objection to the Proposed Amended Consent Decree with regard to its use of "tolerances" or on any other basis is also significant to this Court and reinforces its assessment that the parties' compromise is a fair and reasonable one that is in the best interests of the class.

The Proposed Amended Consent Decree represents a comprehensive program by which approximately 2,200 of BFRC's stores will be inspected and enhanced as may be necessary (or verified as already in compliance) to be accessible to persons with mobility and dexterity disabilities over the next 5 years. The evidence presented to the Court during the fairness hearing reflected that such broad accessibility enhancements could not be reasonably made on such a timetable absent approval of the proposed settlement. Indeed, the P&A Objectors' own expert, James Terry, testified that, without the use of the objective tolerances proposed by the parties, each element of BFRC's stores would have to be individually reviewed and subjective determinations made as to whether a numerical deviation from the ADAAG would be justified. Based on this Court's experience and judicial notice, such a scenario would result in many years of litigation involving hundreds, if not thousands, of the defendant's stores with the inevitable result being that the class would have delayed varied accessibility to defendant's stores. Such a result is antithetical to the goal of Title III and represents a strong policy reason to approve the parties' proposed settlement.

Objectors' main point of contention is that the proposed "tolerances" represent a substituted set of minimum dimensional standards that will not provide the convenient accessibility to BFRC's stores that Title III requires. The evidence submitted by way of affidavit and live testimony, convinces this Court that such is not the case and, to the contrary, that the proposal which the parties have submitted will ensure that the class has the requisite access to BFRC's stores. The use of tolerances only helps accelerate the process of providing access by defining, at the onset, what is and what is not an acceptable condition. The evidence showed that the tolerances chosen by the parties and their experts

were not arbitrary, but are based on recognized anthropometrical and other data that will result in access at BFRC's stores. Indeed, both experts agreed that, were the tolerance mechanism of §3.2 of the ADAAG employed, it could result in widely varying decisions from store to store and state to state over what is an acceptable tolerance. Here , the tolerances are objectively defined and their application may well result in the enhancement of a particular element's accessibility that would not have otherwise been required in the absence of this settlement. The curb ramp width, one of objectors' main concerns, provides a good example. ADAAG specifies that a curb ramp must be designed to be 36" wide minimum.[9] The proposed in-place construction allowable tolerance for such a ramp is 35" wide (minimum). Thus, if the curb ramp is constructed at 34" wide, it must be modified to the 36" minimum width required by ADAAG . However, in practice,  34" or even less might be found to be acceptable by a building inspector or court on an individualized basis. The result being, that the objective tolerances proposed by the parties can potentially provide the means to achieve a greater proximity to ADAAG's design standards than might result from the subjective field decisions when implementing §3.2.

The Ninth Circuit very recently considered the exact objection being raised here (tolerances for new construction) and, in approving the use of post-ADAAG tolerances in an Americans with Disabilities Act Consent Decree, found that their use did not constitute a substituted set of minimums as argued the objectors here:

> Assuming arguendo that the consent decree sets forth lower standards than those required under the ADA, Appellants' argument still fails because the consent decree need not impose all the obligations and duties set forth in the ADA and its regulations. United States v. Oregon, 913 F.2d 576, 581 (9th Cir.1990) ("[A] consent decree need not impose

---

[9]      Nothing in the settlement proposed by the parties changes ADAAG's obligation to design to the values promulgated under ADAAG.

all the obligations authorized by law.") (citations omitted).  Moreover, the federal government can still compel ARCO to comply with the full extent of the ADA by filing suit. 42 U.S.C. § 12188(b) (authorizing the Attorney General to commence civil actions in district court to enforce compliance under the subchapter).  Thus, Appellants' argument fails.

*Molsky v. Gleich*, No. 00-57099, 2002 WL 31261156, *19, n.24 (9th Cir. Oct. 10, 2002).

This Court finds the objectors' rigid view, that all post-ADAAG tolerances must be rejected, to be incompatible, and in some respects antagonistic, to the class action vehicle and the best interests of the class.  While objectors' proposed approach, requiring "fact intensive" determinations of ADA discrimination, may be appropriate in the context of a single store location, it is not reasonably feasible nor effective where relief is sought for 2,200 stores on a nationwide basis.  Indeed, when objectors made similar objections in the *Amoco Oil* case referenced above, Judge Gold rejected them, concluding that:

> In this case, *it is objectors who are at odds with Congress intent by opposing any resolution on a class basis* - leaving disabled individuals with the burden of bringing multiple actions against each B.P.S. gas stations and convenience stores.  Those thousands of suits, the great majority of which will never be brought, would result in varying and inconsistent degrees of relief, contrary to the ADA's very purpose.  It is unimaginable that such lawsuits, if ever completed would result in gasoline stations and convenience stores more accessible than provided for in this decree.

*Amoco Oil*, at p.19.

The Court has carefully considered and evaluated each specific objection to the proposed tolerances, taking into consideration the respective opinions offered by the parties' experts, James Di Luigi and James Terry.  The Court concludes that the objections are not well founded, particularly in the context of the proposed national settlement.  The proposed schedule of tolerances provides a uniform, predictable and effective measure by which BFRC will fairly and timely achieve the ADA goal of complete access to its 2200 stores.

Additionally, the Court finds that the parties' proposed settlement agreement meets the *Bennett* factors noted above.

### 1.      Likelihood of Success at Trial

Trial on the merits of plaintiff's claims and defendant's defenses would be a monumental undertaking given that BFRC has 2,200 stores nationwide, each of which would involve separate discovery, evidentiary proof and argument to determine, in either a single trial  or a series of trials, or a series of cases, involving *inter alia*, what barriers to access existed and whether, and to what extent, any modifications were legally required.  Of course, BFRC's defenses, such as technical infeasibility and structural impracticability, would also have to be thoroughly litigated in each instance.  Numerous disputes would, of course ensue, and, based on the differences expressed by the experts during the October 18, 2002 Fairness Hearing, a battle of the experts over almost every facet of the parties' positions would certainly result, necessarily dragging out any resolution for many years beyond the five years required here.  During that extended period class would be deprived of the important benefits provided by the proposed settlement now before the Court, with no guarantee that the class members would ultimately gain access equal to or greater than that guaranteed by the proposed settlement.  The court, in *Access Now v. v. AMH CGH, Inc.*, aptly noted the quandary such a situation would present:

> Any ultimate determination of liability would require individualized examinations of each Defendant Facility, which would foreseeably involve questions including: whether the Facilities are public accommodations under the ADA; whether the Facilities denied full and equal enjoyment and access to individuals with disabilities; whether the Facilities have made reasonable modifications when necessary to afford accommodations to individuals with disabilities; whether the Facilities failed to remove barriers in existing facilities when such removal is readily achievable and technically feasible; and what measures, if any, are legally required to bring the facility into compliance with the ADA.

*Access Now*, 2001 WL 1005593 at *3.

Clearly, the complexity of plaintiff's claims and defendant's defenses and the length of time that would be involved in a full blown litigation of them makes the likelihood of plaintiff's success at trial highly uncertain.

### 2.    Range of Possible Recovery

This action seeks injunctive relief only; thus, recovery could range from a finding of no liability to a finding of partial or complete liability for <u>each</u> of BFRC's 2,200 stores. Plaintiff could, in fact, receive nothing, as happened in the *South Florida Stadium Corp.* case, even though there were technical violations of ADAAG found by the Court. Plaintiff could expend enormous time, effort and resources and achieve only a fraction of the relief sought, after an extremely lengthy and expensive trial. Based on the evidence presented at the second Fairness Hearing, the analysis necessary for each element at each store would likely delay resolution for many years. Moreover, it is questionable whether, even if plaintiff could successfully litigate its claims as to all 2200 stores, the ultimate results would be more beneficial to the class than those achieved through the proposed settlement.

### 3.    The Point on or below the Range Of Possible Recovery at Which a Settlement Is Fair

This *Bennett* factor examines the relief proposed for the class to determine whether it is fair. Here, the evidence shows that the proposed settlement envisions construction expenses of at least $10 million as part of a comprehensive plan to make sure that persons with dexterity and mobility disabilities can access BFRC's 2,200 stores on a predetermined schedule within the next 5 years. Where access is not feasible for some valid reason, the parties have provided for additional, alternative measures, which may not even be legally required, but will be employed for the benefit of the class. Similarly, the parties' settlement imposes objective measurement criteria for ensuring access to older "existing facilities", many of which exceed the requirements of Title III.

Clearly, the plaintiff is achieving most of the relief sought in the Complaint and, in may ways, in excess of what it could reasonably expect to achieve at trial. It is certainly achieving this relief in a far more expedited manner than would be the result if this matter were to run the normal course of litigation and appeal, especially in the context of 2,200 stores. That the United States Department of Justice chose not to object to the Proposed Amended Consent Decree is significant since it is the chief federal agency charged with enforcement of Title III.

Accordingly, the Court finds that the evidence, taken as a whole, establishes the parties' settlement as fair, adequate, and reasonable.

### 4.      Complexity, Expense and Duration of Litigation

The uncontroverted evidence is that litigation of this complex, extensive case would be expensive and time consuming. An appeal after trial would surely follow. The enormous amount of time that attorneys and experts would have to expend in litigating all of the claims would be very expensive. The litigation would take an inordinate amount of court time and resources as well. Thus, settlement inures to the benefit of all.

### 5.      Substance and Amount of Opposition to Settlement

Despite the extensive notice efforts described above, no individual class member filed an objection. The only objection filed was proffered by a group of agencies, and it was limited to the use of tolerances for new construction and alterations. A similar objection filed by essentially the same objector group was recently rejected in *Amoco Oil*. In view of the nature of this litigation and the complexity and extend of the proposed settlement, the objections to the settlement have been relatively insubstantial to begin with. Furthermore, the parties have resolved all but the one remaining objection by modifying their settlement proposal. The lack of substantial, remaining objections to the Proposed Amended Consent Decree weighs in favor of approval.

24

6.  **Stage of Proceeding at Which the Settlement Was Achieved**

The course of events in this litigation shows that it was fairly contested prior to and during settlement discussions. Two million out-of-state documents were produced, and an Offer of Judgment, under Rule 68, was filed, which threatened the viability of the class and, hence, the relief herein gained. This latter tactic, in particular, shows that the parties' relations were anything but collusive. The parties engaged in substantial informal discovery, personally inspected many of BFRC's stores and retained accessibility experts/architects who attended settlement discussions, provided consultation and inspected stores typical of BFRC's inventory of stores. Negotiations lasted for over ten months before the parties reached the proposal now before this Court. The Court is convinced, and there has been no proof to the contrary, that the settlement was the result of an arms-length process, and was not the product of collusion.

7.  **Judgment and Experience of Counsel for the Parties**

The qualifications of counsel are more than adequate on both sides. Counsel for both parties have a wide range of courtroom experience, including class actions and matters brought under Title III of the ADA. As indicated above, the Court is satisfied and finds that the settlement is not the product of collusion or fraud and that the experience and judgment of the parties' respective counsel was used to ably advocate the interests of their respective clients in order to reach a settlement that is fair and which provides certain, immediate and meaningful relief to the class.

III   **CONCLUSION**

For all of the foregoing reasons, the Court finds that the requirements of Rule 23(a) and 23(b)(2) for final certification have been met and that the parties' proposed settlement is fair and reasonable and fully satisfies the Bennett factors. Accordingly, it is **ORDERED and ADJUDGED** that:

(1)     The proposed settlement class is FINALLY CERTIFIED as a class pursuant to Rule 23(a) and (23(b)(2).

(2)     The Proposed Amended Consent Decree is FOUND to be fair and reasonable and in the best interests of the class and is APPROVED and ADOPTED as the Order of this Court as if fully recited herein.

(3)     The objections to the Proposed Amended Consent Decree are OVERRULED in their entirety.

(4)     This Court RETAINS jurisdiction, pursuant to the terms of the Proposed Amended Consent Decree, for enforcement purposes as well as for the determination of fees and costs as specified therein.

(3)     The Clerk is DIRECTED to enter this Final Judgment and Order, pursuant to Rule 58, *Fed.R.Civ.P.*

**DONE AND ORDERED** in Chambers in Miami, Dade County, Florida, this 30st day of October, 2002.

PAUL C. HUCK
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Donald Feldman, Esquire
William M. Franz, Esquire
Thomas H. Loffredo, Esquire
Joseph H. Calvin, III, Esquire

26